**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

|  |  |
|---|---|
| United States of America,            )<br>              Plaintiff,                        )<br>                                              )<br>v.                                            )<br>                                              )<br>Edward Anson Valdez and       )<br>Antoniet Meza-Ojeda               )<br>                                              )<br>              Defendants.                )<br>_____) | No. CR 06-01628-TUC-DCB (JM)<br><br>**REPORT AND RECOMMENDATION** |

Pursuant to District Judge David C. Bury's Order of September 1, 2006, this matter was referred to Magistrate Judge Jacqueline Marshall for all pretrial matters. Defendants Valdez and Meza-Ojeda each filed a pretrial Motion to Suppress (Docs. # 23 and # 26).[1] The Government responded to both motions on December 4, 2006 (Doc. # 34). The motions were heard by the Magistrate Judge on December 19, 2006, and on January 17, 2007. Defendants were present and represented by counsel. The Government called four witnesses, United States Immigration and Customs Enforcement ("ICE") Agents Sandoval, Hyer, Valenzuela, and Balliet. The witnesses were sworn, examined and cross-examined. The Government offered six exhibits (Exhibits 1 through 6), all of which were admitted. The defense presented no witnesses but Defendant Meza-Ojeda presented testimony in the form of an affidavit which was marked and admitted without objection as Exhibit 101.

---

[1]The third named defendant, Jesus Manuel Javalera-Garcia, did not file nor join in co-defendants' pre-trial motions.

Having considered the matter, the Magistrate Judge recommends that Defendants' Motions be denied. The Court submits the following Findings of Fact and Conclusions of Law.[2]

## I.    FINDINGS OF FACT

On August 29, 2006, ICE agents were parked in undercover vehicles at the Home Depot located on Irvington and I-19. (TR1 7-8; 22, 105.)[3] The purpose of the surveillance operation was to look for individuals who were buying large amounts of contractor stretch wrap (TR1 8), follow the individuals to their possible "stash house" (TR2 60) and conduct a "knock and talk" (TR1 75) with the expectation that agents would discover marijuana (TR1 118).

According to Agent Balliet, who was not at the Home Depot conducting the surveillance but joined agents later, he conceived of and started the case initiation operation at area Home Depots in mid-2002. (TR2 60-61.) Agent Balliet had participated in the execution of various search warrants throughout Tucson and found the same white contractor's stretch wrap boxes at 6 or 8 stash houses. (*Id.*) After conducting some research, he determined that the Home Depot is the only place in Tucson that sells that particular brand of plastic wrap. (*Id.*) Since then, he has been involved in over 100 operations at various Home Depots throughout Tucson that have resulted in seizures of multiple tons of marijuana, large sums of U.S. currency, weapons and vehicles. (*Id.*)

On that particular afternoon in August, ICE Agents Sandoval, Hyer and Valenzuela observed a young male wearing a red shirt coming out of the Home Depot pushing a cart with eight boxes (approximately 8,000 feet) of contractor stretch wrap. (TR1 10, 73.) He placed it into the back of a Denali sport utility vehicle and drove to the exit towards

---

[2] Trial is scheduled before the District Court on March 6, 2007. (Doc. # 48.)

[3] "TR1" refers to the Transcript of Motion Hearing dated December 16, 2006, and filed with the Clerk on January 3, 2007. (Doc. # 43.)  "TR2" refers to the Transcript of continued Motion Hearing dated January 17, 2007, and filed with the Clerk on January 18, 2007. (Doc. #51.)

1  Irvington. (TR1 10-11.)  Agents were suspicious because the man was not wearing a work
2  shirt but a clean Polo shirt and was not driving a work truck with ladders or other things
3  affixed to it but a high priced, newer model car that was in good condition. (TR1 11-12.)
4  According to Agent Valenzuela, the value of a vehicle like this would be approximately
5  $40,000. (TR1 100.)

6  Agent Hyer ran a registration check on the Denali and received a hit in their Treasury
7  Enforcement Communication System ("TECS hit") authored by Agent Balliet indicating that
8  the vehicle might be used by individuals involved in money or drug crimes. (Id., 73, 100.)
9  Agent Hyer contacted Agent Balliet and learned that he had been investigating the case for
10 nine months and that it involved a large scale marijuana smuggling and distribution network,
11 money laundering, weapons and a variety of different violent crimes. (TR2 59.)  Agent
12 Sandoval also spoke to Agent Balliet and was informed that the Denali was associated with
13 the Edward Valdez case (TR1 73) and registered to Philip Sanchez, a major player in the
14 organization. (*Id.*)  Agent Balliet decided to join the surveillance. (TR2 61.)

15 While maintaining radio communication with one another (TR 87), five agents in four
16 undercover vehicles took turns following the Denali. (TR1 16-17, 75.)  After leaving the
17 Home Depot, the Denali proceeded eastbound on Irvington to I-19 northbound and then to
18 I-10 westbound. (TR1 12.)  Agents continued to follow the vehicle and it exited the
19 interstate at Prince Road and proceeded eastbound.  At Campbell Road, the vehicle turned
20 northbound (TR1 12) and then east on Roger where it parked for a few seconds at an
21 apartment complex, made a u-turn, traveled west on Roger and then south on Mountain
22 Avenue. (*Id.*)  From there, the Denali went east on Prince and again north on Campbell,
23 essentially driving in a circle, until it stopped at an address on Vine Street. (*Id.*)

24 According to Agent Sandoval, this type of driving is referred to as a "heat-run," a way
25 of trying to identify if undercover police officers are following. (TR1 15.)  A driver will go
26 to a dead end street and park and try to notice any pattern of the cars that are following.
27 (TR1 16.)

28
- 3 -

1    On Vine Street, the Denali was parked at a residence, "rear-ended into the like a side
2 of the driveway - - not actually on the driveway." (TR1 16:24-25.)  A white SUV (later
3 described as a Yukon; sometimes referred to as a Tahoe or GMC) was also parked at the
4 Vine Street address.  (TR1 17, 77, 105.)  By this time, Agent Balliet, had joined the
5 surveillance and had arrived at the Vine Street home.  (TR2 61.)  Agent Balliet noticed a
6 third car, a distinct blue Dodge truck that he knew from previous occasions belonged to
7 Eddie Valdez.  (TR2 63.)  Agent Balliet's intention was to meet Agent Valenzuela at the
8 house and do a "knock and talk"  (TR2 64:6), but as he drove by the house, he noticed that
9 three men came out of the house and headed toward the Yukon and the Denali.  (TR2 65.)

10   According to Agent Sandoval, who had also been watching the Vine Street house, the
11 Denali remained there for about 15 minutes (TR1 17) and then three Hispanic males came
12 out of the house and got into the Yukon and the Denali. (TR1 104.)  One of the men was the
13 same individual who was wearing the red shirt who had purchased the stretch wrap.  (TR 2
14 64.)  Both cars, "traveling in tandem," proceeded east on Allen towards Campbell.  (*Id*.)
15 Agent Sandoval defined "traveling in tandem" as cars traveling closely together, one behind
16 the other; the car in front trying to lead the way somewhere and the car in back not knowing
17 where to go.  (TR1 17-18.)

18   According to Agent Sandoval, both cars went south on Campbell, then the Yukon
19 made a sudden turn onto King Street, which is right off of Campbell, south of Allen near a
20 shopping mall. (TR1 18.)  Agent Valenzuela described the Yukon as breaking off and taking
21 off at "a high rate of speed behind the shopping mall."  (TR2 25:21-22.)  Agent Valenzuela
22 followed the Denali (TR2 25) and Agent Sandoval followed the Yukon.  (TR1 18.)

23   Agent Sandoval initially lost sight of the Yukon but then heard via the ICE radio that
24 it was traveling westbound on Prince.  (TR1 18-19.)  After locating the vehicle and following
25 it for a short time, and then lost sight of it again for a few seconds, but eventually drove up
26 right behind it (TR1 21-23), making eye-contact with the driver as the driver constantly
27 looked at him through the rearview mirror.  (TR1 23.)  Judging the distance from where
28
- 4 -

1  Agent Sandoval was to the location the Yukon was first reported, Agent Sandoval testified
2  that the Yukon would have had to speed to cover the distance. (TR1 18-19.) According to
3  Agent Sandoval, he tried to catch up to the Yukon but the driver was "driving pretty
4  erratically in and out of traffic" (TR1 24:14), not using his turn signal and darting in and out
5  of traffic in front of him. (TR1 24.) At one point, the Yukon cut him off in traffic. (TR1 23,
6  80.)

7  Agent Sandoval then made contact with Agent Valenzuela, the lead agent and the one
8  in charge of the group at the Home Depot (TR1 100), who instructed him to stop the Yukon.
9  (TR1 25.) Since Agent Sandoval was the only agent following the Yukon, he put out a radio
10 call that he needed some back-up. (*Id*.) As he was approaching Grant Road and First
11 Avenue, he noticed Agent Hyer come up with activated emergency lights and he too
12 activated his lights. (*Id*.) Since the Yukon was stuck in traffic at a red light, he was already
13 stopped. (*Id*.) There was a lot of traffic, the area was congested, and the Yukon was the
14 third car at the light, so it had no where to go. (TR1 26.) Agent Sandoval pulled up right
15 behind the Yukon (*Id*.), got out of his car and signaled to the driver to get out. (TR1 27.)
16 The driver walked out and another agent handcuffed him. (TR1 28.) According to Agent
17 Sandoval, the reason the driver was handcuffed was for the agents' safety as well as his own,
18 until they could determine what was going on. (*Id*.)

19 Agent Hyer had also received a radio call to stop the Yukon from either Agent
20 Valenzuela or Agent Balliet. (TR1 80.) It was almost 5:00 rush hour traffic and Agent Hyer
21 was two traffic lights behind the Yukon, so he activated his lights and siren to make it
22 through traffic and through a couple of red lights to catch up. (TR1 80-81.) By the time
23 Agent Hyer got to the intersection, Agent Sandoval was already approaching the Yukon.
24 (Id.) Agent Hyer drove up about half a car behind the Yukon (TR1 26) with his car off the
25 right lane partially on the curb. (TR1 82.) Agent Hyer drew his weapon but did not point
26 it at anybody and waited to make sure everything was safe. (*Id*.) By the time he approached,
27 the driver was already walking out with Agent Sandoval. (*Id*.) Agent Hyer then holstered
28

1  his weapon as he approached the passenger and asked him to step out of the car. (TR1 82-
2  83). Upon learning that the passenger did not speak English, Agent Hyer handcuffed him
3  for officer safety and handed him off to another agent. (TR1 82-83.)

4  After getting the identification of the driver and passenger, agents learned that the car
5  was registered to Eddie Valdez, who they knew was a target of Agent Balliet's investigation.
6  (TR1 32-33.) Agent Hyer moved the Yukon out of the area to a nearby restaurant near the
7  intersection. (TR1 84.) According to Agent Sandoval, he made that decision for the safety
8  of the agents as well as that of the two occupants, to get them out of the area, out of the heavy
9  traffic. (*Id.*) There were a lot of people trying to get around and Agent Sandoval was
10 concerned that someone would hit them or one of their cars. (TR1 31.)

11 After moving everyone, Agent Sandoval did a protective sweep of the Yukon and saw,
12 but did not take, a yellow envelope with a large amount of currency behind the driver's seat.
13 (TR1 30-31.) Agents did not find any weapons. (TR1 31-32, 84.)

14 As for the Denali, Agent Valenzuela had stayed behind it as it eventually turned in the
15 same direction as the Yukon had, into a shopping plaza at the northwest corner of Campbell
16 and Prince. (TR1 106.) Agent Valenzuela was about a car length behind the Denali when
17 he activated his emergency lights. (TR1 107.) Instead of stopping, the Denali circled the
18 parking lot, turned right on Prince and began to travel west (TR1 110) finally stopping on
19 Crest Ranch Road. (TR1 111.) When asked for identification, the driver provided a Mexican
20 I.D. which identified him as Antoniet Meza-Ojeda. (TR1 115.)

21 According to Agent Valenzuela, when he approached the driver he did not draw his
22 weapon. (TR1 112.) Nor did any of the other agents draw their guns. (*Id.;* TR2 6, 69.)
23 According to Meza-Ojeda, guns *were* drawn. Two officers "converged on [his] vehicle with
24 their guns drawn and ordered [him] out of the car at gunpoint." (Meza-Ojeda Affidavit ¶ 3;
25 Doc. # 46.)

26 While Meza-Ojeda was still seated in the driver's seat of the Denali (TR2 73), Agent
27 Valenzuela advised him of his *Miranda* warnings in Spanish and asked him who the car

28

1  belonged to. (TR1 112-113, TR2 70.) Meza-Ojeda said it was Richard's, a friend of his, but
2  he did not know his last name. (TR1 115.) The name "Richard" was of significance to Agent
3  Balliet, who was present during the questioning. (TR2 70.) He knew Richard to be Phillip
4  *Richard* Sanchez. (TR2 71.) At Agent Balliet's request, Agent Valenzuela also asked Meza-
5  Ojeda if he knew about the contractor stretch wrap or about any marijuana (TR1 112-113,
6  TR2 70), and he replied that he did not know about any marijuana and explained that he was
7  using the contractor wrap to wrap some sort of furniture. (TR2 70.) Five minutes later, he
8  said he was taking the stretch wrap to Mexico. (*Id.*)

9        Meza-Ojeda gave agents consent to search the Denali (TR1 114) and agents removed
10 him from the car. (TR2 73.) While going through Meza-Ojeda's wallet, agents found a AAA
11 member's card in the name of Edward Valdez. (TR2 71.) This was also significant to Agent
12 Balliet; it meant that Valdez was at the house and that Meza-Ojeda was somehow involved
13 with Valdez. (TR2 72.) Agents also found a desert camouflaged handheld radio. (TR2 74.)
14 Agents did not find any contractor's stretch wrap in the Denali. (TR2 69, 73.)

15       Just prior to searching the Denali, Agent Sandoval informed Agent Valenzuela that
16 he had stopped Valdez in the Yukon and found a large envelope of U.S. currency. (TR1 117,
17 TR2 72.) Agents Valenzuela and Balliet then handcuffed Meza-Ojeda and placed him into
18 another agent's car. (TR1 117-118; TR2 6.)

19       After not finding the stretch wrap in the Denali, agents decided to take Valdez and
20 Meza-Ojeda to the Vine Street house and conduct a consent search. (TR2 6.) Only one
21 agent had been maintaining surveillance of the house and, due to safety concerns (especially
22 when the house is a suspected stash house), did not approach the house by himself. (TR1
23 118.) So for that agent's safety, more agents were needed before a consent search was
24 attempted. (TR2 6.) In Agent Balliet's opinion, at least five to six agents are needed to
25 safely approach a house. (TR2 76.)

26       Agents Valenzuela and Balliet drove to the Vine Street address (TR1 117; TR2 7) and
27 other agents transported Meza-Ojeda to the house. (TR2 5.) A third agent guarded the

28

- 7 -

1 perimeter of the house while Agent Valenzuela and Agent Balliet put on their body armor,
2 approached the residence and knocked. (TR2 7, 81.) After receiving no answer, they walked
3 to the north side of the house and saw a studio like apartment or storage room connected to
4 the main house by a breeze way. (TR2 81-82.) Next to the house, Agent Balliet saw stacks
5 of boxes of white contractor stretch wrap. (TR2 82.) He could also smell a moderate odor
6 of marijuana coming from the apartment like building. (*Id.*) Agent Balliet walked to a little
7 room that faced the street that was accessed by the driveway and looked into the window.
8 (*Id.*) There he saw a box of contractor's stretch wrap identical to the ones he saw outside the
9 house. (TR2 83.) He also saw the exposed corner of what looked to him to be a bundle of
10 marijuana. (*Id.*) Agents began working on a search warrant. (*Id.*)[4]

11 Agent Valenzuela got on the phone with Agent Sandoval (who was still with Valdez
12 and the Yukon on First Avenue) and requested that Valdez be transported to the Vine Street
13 address. (TR1 118.) According to Agent Valenzuela, his instructions were, "[h]ey, we have
14 dope, bring him back." (TR2 8:1.) Agent Balliet, who was standing next to Agent
15 Valenzuela when he made the call, heard him say to Agent Sandoval, "[h]ey, we've
16 got–we've got dope over here, why don't we get everybody back over here?" (TR2 83:25,
17 84:1.) Agent Sandoval only recalls Agent Valenzuela telling him to take the suspects back
18 to the house. (TR1 33-34.).

19 At the time of Agent Valenzuela's call it had been 10 to 20 minutes since the stop of
20 Valdez on First Avenue. (TR1 33, 85, TR2 70.) It had been no more than 10 minutes since
21 the stop of Meza-Ojeda on Crest Ranch Road. (TR2 5.) It took approximately 15 to 20
22 minutes to drive Valdez (TR1 34, 86) and about 2 to 5 minutes to drive Meza-Ojeda to the
23 Vine Street address. (TR2 5, 79.)

---

25 [4]Magistrate Judge Marshall issued the search warrant for the Vine Street residence. This fact
26 was addressed by the parties informally before the first hearing on pending motions. Since
Defendants' motions involved the legality of the stop and arrest of the Defendants and not the
27 legality of the search of the house, neither party expressed an objection to having the same
magistrate judge rule on pending motions.

28
- 8 -

## II. CONCLUSIONS OF LAW

### A. Stop

The Fourth Amendment prohibits "unreasonable searches and seizures" by the government. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). To justify a *Terry* stop, an officer must point to specific and articulable facts which, taken together with rational inferences, reasonably warrant the intrusion. *Id.* In making reasonable suspicion determinations, courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *United States v. Cortez*, 449 U.S. 411, 417-418 (1981). This process allows an officer to rely on his own experience and specialized training to make inferences from and deductions about the cumulative information available that "might well elude an untrained person." *Id.,* at 418; *U.S. v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000).

In its evaluation, a court may look to the collective knowledge of all officers involved in a criminal investigation to determine reasonable suspicion and probable cause. *United States v. Bertrand*, 926 F.2d 838, 845 (9th Cir.1991). Traditionally, the Ninth Circuit has applied the collective knowledge doctrine in two situations: first, when officers are participating together in an investigation, the missing pieces are imputed to the officer conducting the stop even if each officer has not explicitly communicated the facts he has learned independently to the officer conducting the stop, *Bailey v. Newland*, 263 F.3d1022, 1031 (9th Cir. 2001), and second, when agents are *not* participating together in an investigation, the officer with direct personal knowledge of all the facts directs or requests that a nonparticipating officer conduct the stop, *United States v. Del Vizo*, 918 F.2d 821, 826 (9th Cir. 1990).

Most recently in *United States v. Ramirez*, --- F.3d ---; 2207 WL 148795, 4 (9th Cir. Jan. 17, 2007), the Ninth Circuit addressed the distinction between officers in a "coordinated-investigation" (those officers functioning as a team) and officers "minimally communicating" (those officers acting as independent actors who merely happen to be investigating the same

- 9 -

1 subject). Blurring the Court's earlier distinction, the *Ramirez* Court noted, "[i]ndeed, where
2 one officer directs another to take some action, there is necessarily a 'communication'
3 between those officers, and they are necessarily functioning as a team." *Id*. at 8. After
4 conducting a lengthy analysis of Supreme Court cases as well as other circuit court cases, the
5 Ninth Circuit held that "[w]here one officer knows facts constituting reasonable suspicion
6 or probable cause (sufficient to justify action under an exception to the warrant requirement),
7 and he communicates an appropriate order or request, another officer may conduct a
8 warrantless stop, search, or arrest without violating the Fourth Amendment." With respect
9 to the type or order or request required, the Court held that the collective knowledge doctrine
10 includes no requirement regarding the content of the communication that one officer must
11 make to another. *Id*. at 9.

12 Here, the agents had ample reason to stop Meza-Ojeda and Valdez. They had watched
13 Meza-Ojeda, a young man who was not dressed as a construction worker, walk out of the
14 Home Depot with approximately 8,000 feet of contractor stretch wrap and get in a $40,000
15 Denali sport utility vehicle. Similar facts, according to Agent Balliet, had previously led
16 agents to stash houses and seizures of marijuana, currency, weapons and vehicles. When the
17 agents ran a registration check on the Denali, they found that it was suspected of being used
18 in money and drug crimes and was associated with Valdez, who was the subject of an
19 ongoing investigation. Meza-Ojeda then drove in an evasive manner consistent with what
20 agents characterize as a "heat run" designed to determine if anyone is following, before
21 finally going to the Vine Street residence. Once at the residence, Agent Balliet, who had by
22 then joined in the operation, saw a truck belonging to Valdez. Three men eventually came
23 out of the house, one of them matching the description of Meza-Ojeda, and got into the
24 Denali and a Yukon, which was also parked at the residence. The two vehicles left the
25 residence traveling in tandem, which Agent Sandoval described as suspicious behavior, and
26 then went in different directions taking what appeared to be evasive measures.

27
28

Relying heavily on *United States v. Thomas*, 211 F.3d 1186 (9th Cir. 2000), Meza-Ojeda asserted that the factors cited in support of the stop "are no more than 'a sum of zeros.'" However, the facts found insufficient to support reasonable suspicion in *Thomas* fall far short of the facts here. In *Thomas*, FBI agents told a Pima County Sheriff's Department detective that he "might want to pay particular attention to a certain house" because there was "a suspicion that there was a possibility that there might be some narcotics" there. *Id.* at 1188. During surveillance of the house, the detective observed four individuals leave the house and drive off. The detective attempted to follow the vehicle but lost it and returned to continue surveillance of the house. *Id.* Later in the day, the detective observed a man with a bag leave the house in another vehicle. That vehicle was stopped and the bag was searched and no evidence of narcotics was found. *Id.* A short time later, another vehicle arrived at the house and the passenger was identified as one of the four individuals who had left the residence earlier in the day. *Id.* The driver backed the vehicle partially into the garage and the detective, who could not see inside the garage, "heard three or four thumps from inside the garage," which he believed was the sound of marijuana being loaded into the vehicle. *Id.* When the vehicle left the house, the detective ordered it stopped and officers then noticed the odor of marijuana and ultimately found marijuana in the vehicle and at the home. *Id.* at 1188-89. When faced with these facts, the Ninth Circuit found that the tip lacked any indicia of reliability, the comings and goings at the house did not provide any indicia of illegal activity, and the sound of marijuana being loaded into a vehicle constituted only an unsupported hunch, thus resulting in a "sum of zeros" that did not support reasonable suspicion for the stop of the vehicle. *Id.* at 1190-92.

The facts of this case do not amount to the "sum of zeros" the Ninth Circuit found in *Thomas*. Here, agents were aware of the contractor wrap purchase, the dress and vehicle driven by Meza-Ojeda, the heat run, the Valdez vehicle at the Vine Street residence, the tandem departure and the evasive driving of both the Yukon and the Denali. These are exactly the sort of facts that are associated with illegal activity. *See, e.g., United State v. Del*

*Vizo,* 918 F.2d 821, 826 (9th Cir. 1990) (tandem driving and evasive action); *United States v. Tenorio*, 360 F.3d 491 (5th Cir. 2004) (heat runs); *United States v. Araiza-Sotomayor*, 143 Fed.Appx. 809 (9th Cir. 2005) (shrink wrap purchases); *United States v. Smith*, 217 F3d 746, 750 (9th Cir. 2000) (evasive actions, such as not immediately submitting to an officer's show of authority). Considered collectively, these facts gave agents reasonable suspicion to stop Meza-Ojeda.

These same factors support the stop of Valdez's vehicle. Agents had witnessed Meza-Ojeda's behavior from the Home Depot to the Vine Street residence and then watched Valdez, in the Yukon, and Meza-Ojeda, in the Denali, depart the residence in tandem and take evasive action. After leaving the neighborhood, the Yukon made a sudden turn and traveled at high-speed behind a shopping mall. After losing the Yukon, Agent Sandoval regained sight of it and eventually drove-up right behind it. The Yukon proceeded to drive erratically, not using turn signals and darting in and out of traffic. Coupled with the information gleaned from the surveillance of Meza-Ojeda, these circumstances gave agents reasonable suspicion to stop Valdez. In fact, the traffic infractions alone are sufficient to support the stop. It is well settled that evidence of a traffic violation is sufficient reasonable suspicion to stop a vehicle even if the ultimate charge is unrelated to the traffic stop. *Wren v. United States*, 517 U.S. 806, 808-809, 819 (1996).

### B.     Continued Detention

An investigatory detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). The investigative methods employed in a *Terry* stop should be the least intrusive means reasonably available to verify of dispel the officer's suspicion in a short period of time. *Id.* When an officer makes a stop supported by reasonable suspicion, he is authorized to take such steps are reasonably necessary to maintain the status quo during the course of the stop. *Id; United States v. Osborn*, 203 F.3d 1176, 1181 (9th Cir. 2000). The reasonableness of a detention may be determined in part by "whether the police are diligently pursuing a means

of investigation which is likely to resolve the matter one way or another very soon . . ." *Michigan v. Summers*, 452 U.S. 692, 701, n.14, (quoting 3 W. LaFave, *Search and Seizure* § 9.2, p. 40 (1978)).

Here, the agents complied with the requirements and diligently pursued the resolution of Valdez and Meza-Ojeda's status. Upon stopping Meza-Ojeda, Agent Valenzuela provided him his *Miranda* warnings and asked him who the Denali belonged to. Meza-Ojeda said it belonged to "Richard," which was significant to Agent Balliet who knew that Phillip Richard Sanchez was an associate of Valdez. Meza-Ojeda was then asked about the stretch wrap and gave inconsistent responses. A consent search of the Denali was then conducted and agents found a AAA card issued to Valdez in Meza-Ojeda's wallet and a handheld camouflaged radio. They did not find the stretch wrap. In the search of the Yukon, agents found a large envelope of U.S. currency, also consistent with drug trafficking. These discoveries did not resolve the agent's suspicions. Rather, the absence of the stretch wrap in particular, prompted the agents to further investigate the Vine Street residence.

There was only one agent at the residence and, due to safety concerns, he did not seek to investigate the residence alone. The agents decided to meet at the residence with the intention of approaching the house. At that time, Meza-Ojeda was promptly transported back to the Vine Street address and agents shortly thereafter donned their body armor and approached the front door of the residence. Their was no answer at the door and the agents then went to the north side of the house. It was there that Agent Balliet noticed stacks of contractor stretch wrap and smelled a moderate odor of marijuana coming from a storage room/apartment. Agent Valenzuela then requested that Agent Sandoval transport Valdez to the residence.

All told, it took no more than 12 to 15 minutes from the time of the stop to transport Meza-Ojeda to the Vine Street residence and 25 to 40 minutes to transport Valdez.[5] During this time, the agents' efforts to resolve the matter were diligent and the suspects' detention prior to arrest lasted no longer than reasonably necessary.

Meza-Ojeda alleges that agents approached his vehicle with their weapons drawn. Sometimes an investigatory stop may involve more than the ordinary risk inherent in contact between police and suspects and officers may have to take particular measures that are more intrusive and aggressive. *Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996). Such police conduct is reasonable if it is in response to legitimate safety concerns. *Id*. For example, approaching a suspect with weapons drawn, while an extraordinary measure, is justified as a reasonable means of neutralizing potential dangers to police and innocent bystanders. *United States v. Sinclair*, 983 F.2d 598, 603 (4th Cir. 1993). If in fact weapons were drawn during the stop, the agents were justified in doing so. Agents had witnessed Meza-Ojeda acting in a manner consistent with drug smuggling. Collectively, agents knew that the case had been under investigation for nine months and that it involved a large scale marijana operation involving money, weapons and a variety of violent crimes.

Based on two days of testimony, however, as compared to Meza-Ojeda's one page Affidavit, the Court finds that only Agent Hyer drew his weapon and that occurred when agents approached Valdez's vehicle, not Meza-Ojeda's. Even in that situation, Agent Hyer holstered his weapon when he determined it was safe to do so.

### C. Protective Sweep of Valdez's Car

The protective sweep of Valdez's vehicle was also justified. In the absence of probable cause, the purpose of a protective search is to neutralize the threat of physical harm

---

[5] While not necessary to support Valdez' continued detention, the Court finds that after agents smelled marijuana at the Vine Street residence, they not only had reasonable suspicion to detain him, but also probable cause to arrest him. Not counting the time it took agents to transport Valdez to Vine Street, Valdez' pre-arrest detention lasted only 10 to 20 minutes.

to police officers and others, *United States v. Barboza*, 412 F3d. 15, 16 (1st Cir. 2005), as well as to allow officers to pursue their investigation without fear of violence, *United States v. Bautista*, 684 F. 2d 1286, 1289 (9th Cir. 1982). Roadside encounters between police and suspects are especially hazardous in that danger may arise from the possible presence of weapons surrounding a suspect. *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). Even a protective sweep of a car's passenger compartment is permissible so long as the search is limited to those areas in which a weapon may be placed or hidden. *Id*. "The issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id*. at 1049 (internal citations omitted). The Fourth Amendment does not require suppression of evidence if, while conducting a legitimate *Terry* search of the interior of an automobile, an officer discovers contraband other than weapons. *Id*.

As concluded above, the stops of Valdez and Meza-Ojeda were reasonable. The purpose of the stops was to investigate suspicion of narcotics trafficking. These circumstances warrant safety concerns and support the decision to conduct a protective sweep of the vehicles.

### D. Arrest

The Government carries the burden of establishing that, "at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense." *United States v. Bernard*, 623 F.2d 551, 559 (9th Cir. 1980) (internal quotation and citation omitted). Probable cause is to be determined based upon the objective facts available for consideration by the officers participating in the arrest. *Id*. at 560-61. When the officers involved are working in close concert with each other, "the knowledge of one officer is the knowledge of all and that in the operation of an investigative or police agency the collective knowledge and the available objective facts are the criteria to be used in assessing probable cause." *Id*. at 561; *United*

- 15 -

1  *States v. Sutton*, 794 F.2d 1415 (9th Cir. 1986). *See also* discussion of *Ramirez, infra* pp. 9-
2  10.

3  There is no dispute that agents had probable cause to arrest Valdez and Meza-Ojeda
4  after the marijuana was discovered. However, both argue that they were effectively under
5  arrest when they were stopped, before the marijuana was discovered. There is no mechanical
6  checklist to distinguish between a *Terry* stop and a formal arrest or the equivalent of an
7  arrest. *United States v. $109,179 in U.S. Currency*, 228 F.3d 1080, 1084 (9th Cir. 2000).
8  Neither complete restriction of liberty nor relocation of a suspect necessarily converts a stop
9  into an arrest. *Id.* (detention not arrest where officer kept gun against his leg, ordered
10 suspect to place his hands on his head, moved suspect from hotel hallway to hotel room and
11 detained him for 17 to 20 minutes).

12 As a threshold matter, this Court finds that the detention of both Defendants was no
13 more intrusive than necessary. In fact, if the Defendants had not departed the residence, the
14 investigation concerning their activities would have been resolved in 10 minutes or less.
15 Moreover, the nature of their detentions does not suggest that the Defendants were under
16 arrest. They were not held at gunpoint, forced to the ground or handcuffed during their
17 respective detentions. *Cf. Washington v. Lambert*, 98 F.3d 1181, 1186 (9th Cir. 1996)
18 (pointing weapon at suspect and handcuffing him, or ordering him to lie on ground, or
19 placing him in police car does not automatically convert stop into arrest). Prior to arrest, they
20 were not transported to a police station or agency office. *United States v. Parr*, 843 F.2d
21 1228, 1231 (9th Cir. 1988) (no arrest when suspect placed into a police car; line between
22 detention and arrest is crossed, however, when suspect is transported to police station). They
23 were merely ordered out of their vehicles and detained until the agents could obtain
24 information based on their suspicions. *United States v. Patterson*, 648 F.2d 625, 633 (9th Cir.
25 1981)(ordering suspect out of car found reasonable); and *United States v. Vanichromanee*,
26 742 F.2d 340, 344 (7th Cir. 1984) (five to ten minutes in parking garage and an additional five
27 to ten minutes in apartment found reasonable given language barrier, need for identification

- 16 -

and need for preliminary questioning).  *Compare United States v. Del Vizo*, 918 F.2d 821, 825 (1990) (detention ripened into arrest where police brandished weapons and handcuffed suspect, and there was no evidence to suggest that the suspect was dangerous).

**III.    RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE**

Based on the foregoing, and pursuant to 28 U.S.C. § 636(b) and Local Rule 1.17(d)(2), Rules of Practice of the United States District Court, District of Arizona,

THE MAGISTRATE JUDGE RECOMMENDS that the District Court, after an independent review of the record, DENY Defendant Valdez' Motion to Suppress filed on October 30, 2006 (Doc. # 23) and Defendant Meza-Ojeda's Motion to Suppress filed on November 14, 2006 (Doc. # 26).

Pursuant to 28 U.S.C. § 636(b), any party may serve and file written objections with the District Court within ten days of being served with a copy of this Report and Recommendation.  If the objections are not timely filed they may be deemed waived. If any objections are filed, this action should use case number: CR 06-1628-TUC-DCB.

DATED this 9th day of February, 2007.

_Jacqueline Marshall_
Jacqueline Marshall
United States Magistrate Judge